UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ERIC MYERS,

    Plaintiff,

-vs-                                          Case No. 5:08-cv-365-Oc-10GRJ

TOOJAY'S MANAGEMENT
CORPORATION,

    Defendant.
_____

## **O R D E R**

The Plaintiff has filed a six-count Complaint against his purported former employer, alleging bankruptcy discrimination in violation of 11 U.S.C. § 525(b), as well as various state and federal wage and hour claims (Doc. 3). The case is presently before the Court for consideration of the Defendant's Motion for Summary Judgment (Doc. 27), and the Plaintiff's Motion for Partial Summary Judgment (Doc. 34). The Parties have filed timely responses in opposition (Docs. 32, 36), and the motions are both ripe for disposition. For the reasons set forth below, the Court concludes the Defendant's motion is due to be granted in part and denied in part, and the Plaintiff's motion is due to be denied.

### **Undisputed Material Facts**

Plaintiff Eric Myers filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Western District of North Carolina in January 2008. Around that same time,

Myers and his two minor children moved to Sumter County, Florida to live with Myers' parents. Myers' debts were fully discharged in May 2008.

At some point in July 2008, Myers learned of an open managerial position at one of Defendant TooJay's Management Corporation's ("TooJay's") restaurants located at Lake Sumter, Sumter County, Florida. On July 16, 2008, Myers contacted Tom Thornton, TooJay's West Coast Regional Manager about the position. After speaking on the phone, Thornton scheduled an in-person interview with Myers for later that month.

The interview went well, and Thornton scheduled Myers for a two-day on the job evaluation to be held on July 31-August 1, 2008. During the on the job evaluation, Myers shadowed various employees in all areas of the restaurant, became familiar with restaurant procedures, and participated in various tasks such as preparing meals. Thornton and other TooJay's employees evaluated Myers' work performance in an effort to determine if Myers would be a good fit for the restaurant. Thornton and Myers agreed that he would be paid $100 per day for the evaluation.

At the conclusion of the second day of the on the job evaluation, Thornton told Myers that he performed well and picked up the restaurant's operations quickly. Myers contends that Thornton also said he had the authority to hire Myers, and that Thornton made an unconditional offer of employment to him. Myers also contends that he and Thornton agreed on approximately 40 hours per week, set a start date of August 18, 2008, and discussed a salary of between $50,000 and $55,000. Thornton, however, asserts that he

never told Myers he was officially hired,[1] never stated that he had the sole authority to hire Myers, and never discussed hours, salary, or a start date. Instead, Thornton states that he merely told Myers any offer of employment would be contingent on the completion of a background check.

The Parties agree, however, that Thornton photocopied Myers drivers license and social security card, and had Myers complete and sign several employment forms. The forms included an IRS employee withholding W-4 form, a medical history form, a payroll deduction authorization and employee discount form, an order form for TooJay's uniform and shoes, a food employee reporting agreement, a trade secret non-disclosure agreement, an assistant manager trade secret non-disclosure agreement, and an I-9 employment eligibility verification form. Thornton also gave Myers a copy of TooJay's employee handbook and sexual harassment policy, and directed Myers to sign acknowledgment forms that he had received copies. On each of these forms, Myers placed his signature in the blank listed for "employee signature."

One other form Myers signed at Thornton's behest was an "Authorization/Release Form" which permitted TooJay's to conduct a comprehensive background check and consumer credit report check. The authorization form stated that Myers released TooJay's "from any and all liability for damages of whatever kind, which may, at any time, result to

---

[1] Thornton testified that while he had the authority to make initial offers of employment, he always checked with upper management, including Sharon Polinski, Vice President of Human Resources, and Neal Chianese, Vice President and Director of Operations.

3

me, my heirs, family, or associates because of compliance with this authorization and request to release." (Doc. 7-2, p. 3). Myers understood that the form authorized TooJay's to conduct a background check and to obtain his credit report, but did not understand - and no one explained to him - that by signing the form he would waive his right to sue TooJay's for bankruptcy discrimination. No one offered or gave Myers any consideration in exchange for signing the release, and he was not given an opportunity to review the release with an attorney. Myers also asserts that no one told him that his employment with TooJay's was contingent upon a satisfactory credit report.

On August 4, 2008, Myers gave notice to his then-employer that he was resigning in order to work at TooJay's. On August 14th or 15th, Myers received a letter from TooJay's, dated August 4, 2008, entitled "Adverse Action Notice." The letter stated that TooJay's was rescinding its previous offer of employment, and that the decision "was based in whole or in part on the information provided us in a Consumer Report or Investigative Consumer Report." (Doc. 34-2, p. 4). Myers called Thornton about the letter, who told Myers that he was not hired because of a "financial matter," and that Thornton was disappointed because he was looking forward to working with Myers. Thornton also told Myers to contact Sharon Polinski, TooJay's Vice President of Human Resources to discuss the issue further.[2]

---

[2]Thornton disputes this version of events. According to Thornton, he did not know TooJay's rescinded the offer of employment until Myers called him, and he never told Myers it was due to a "financial matter." Polinski, however, testified at her deposition that she did talk to Thornton
(continued...)

Myers called Polinski, who told Myers that he was not hired because he had filed for bankruptcy and that TooJay's, as a matter of corporate policy, does not hire individuals who have a bankruptcy on their credit report. Polinski gave no other reason for the decision.[3] Myers urged Polinksi to reconsider, and offered to explain the reasons for the bankruptcy. Polinski said she would think about it and get back to him if TooJay's would be willing to listen. Myers never heard back from anyone at TooJay's. Nevertheless, Myers sent a two-page letter to Polinski, Thornton, and William Korenbaum, TooJay's President, on August 13, 2008, in which he explained why he filed for bankruptcy, emphasized his otherwise good credit history and financial expertise, and asked TooJay's to reconsider hiring him.[4] No one ever contacted Myers, and both Polinski and Thornton admit giving the letter scant attention and discarding it.

Once Myers realized he would not be working for TooJay's, he went back to his prior employer and asked for his job back. By that time, however, Myers' work hours had been

---

[2](...continued)
before the decision was made to rescind Myer's offer, and that Thornton was very much aware of the decision and the reasons behind it.

[3]At her deposition, Polinski stated that TooJay's rescinded Myers' offer of employment because of the bankruptcy on his report, and because he had other instances of delinquent payments. She did, however, admit that the delinquencies were tied into the bankruptcy. In their interrogatory responses, TooJay's also stated that Myers was not hired because he did not have a strong background in the operations field of restaurant management, and had limited experience dealing with food. It appears that TooJay's has now abandoned these performance-based rationales. Moreover, Neal Chianese testified that the only reason Myers was denied employment was due to his bankruptcy.

[4]Myers stated that he filed for bankruptcy only on the advice of counsel, and only as a result of a contentious divorce proceeding.

redistributed to other employees, and Myers could only be rehired at a reduced schedule.

On September 16, 2008, two weeks after Myers filed his complaint in this Court, TooJay's sent Myers a paycheck for the $200 owed from the on the job evaluation. Myers admits receiving and cashing the check in late September.

TooJay's admits that the persons ultimately hired for the managerial position had not previously filed for bankruptcy.

## **Procedural History**

On September 2, 2008, Myers filed a complaint against TooJay's (Doc. 1), which he amended on September 4, 2008 (Doc. 3). The amended complaint consists of six claims: (1) a claim for discriminatory failure to hire in violation of 11 U.S.C. §525(b) (Count I); (2) a claim for discriminatory termination in violation of § 525(b) (Count II); (3) a claim for discriminatory non-payment of wages in violation of § 525(b) (Count III); (4) a claim for non-payment of minimum wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") (Count IV); (5) a state law breach of contract claim for unpaid and lost wages (Count V); and (6) a claim for attorney's fees and costs under Fla. Stat. §448.08 (Count VI). In response to TooJay's motion for summary judgment, Myers voluntarily withdrew his claims under the FLSA and for breach of contract, (Doc. 32, pp. 19-20), and the Court will dismiss those claims. Therefore, the only claims remaining are those under 11 U.S.C. § 525(b) and for attorney's fees under Florida law.

**Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Celetex, 477 U.S. at 324.

**Discussion**

I.  Count I - Discriminatory Failure to Hire

Both Parties seek summary judgment as to Count I, in which Myers alleges that by rescinding its offer of employment on the basis of his bankruptcy, TooJay's unlawfully

discriminated against him in violation of 11 U.S.C. § 525. Putting aside for the moment whether or not an employment relationship already existed between the Parties, it is undisputed that TooJay's has a policy of refusing to hire managerial applicants who have previously filed for bankruptcy. It is further undisputed that the main reason - and most likely the only reason - TooJay's did not hire Myers was due to his bankruptcy.[5] Therefore, the only question remaining is whether TooJay's actions towards Myers fall within the parameters of § 525(b). A close and careful reading of the statute, as well as the existing decisional authority on the issue, reveals that they do not.

Section 525 of the Bankruptcy Code protects individuals from discriminatory treatment. The statute provides two standards: one for governmental agencies in § 525(a) and one for private employers in § 525(b). The government standard, which was enacted in 1978, provides, in relevant part, that:

> (a) . . . a governmental unit may not . . . deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has

---

[5]In its opposition to Myers' motion for partial summary judgment, TooJay's attempts to create a fact dispute by arguing that at least one of the delinquencies on Myers' credit report was not related to his bankruptcy, and therefore affords another reason for denying Myers employment. Although the Court finds this rationale somewhat disingenuous, there is no need to address this point any further, as the Court concludes that § 525(b) does not cover denial of employment claims.

8

not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(a).

The standard governing private employers, which was not enacted until 1984, is somewhat different:

(b) No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt - -

(1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;

(2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or

(3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(b).

A comparison of the words used in subsections (a) and (b) demonstrates that subsection (a) prohibits government employers from "deny[ing] employment to" a person because of his or bankrupt status, whereas subsection (b) does not contain such a prohibition for private employers. Rather, the private sector is prohibited only from discriminating against those persons who are already employees. In other words, Congress intentionally omitted any mention of denial of employment from subsection (b), but specifically provided that denial of employment was actionable in subsection (a). Thus, by its plain language, the statute does not provide a cause of action against private

employers for persons who are denied employment due to their bankrupt status. "Where Congress has carefully employed a term in one place but excluded it in another, it should not be implied where excluded." J. Ray McDermott & Co., Inc. v. Vessel Morning Star, 457 F.2d 815, 818 (5th Cir. 1972).[6]

Myers contends that the inclusion of the word "individual" and the phrase "discriminate with respect to employment," coupled with the public policy behind § 525 to afford debtors a "fresh start," evidences Congress' intent to also include denial of employment claims in § 525(b). In order to adopt this argument, the Court would need to ignore Congress' careful drafting of § 525. When § 525(a) and (b) are read *in pari materia*, the language in § 525(b) cannot possibly be construed to include denial of employment; if that was Congress' intent, Congress would have included the phrase "deny employment to" in § 525(b). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (internal citations omitted).

Except for one decision, all of the courts confronting this issue have held that §525(b) does not encompass hiring decisions of private employers. See In re Burnett, No.

---

[6]The Eleventh Circuit has adopted as binding precedent all decisions of the Fifth Circuit handed down on or before September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

06-34312-H4-13, 2008 WL 4609983 (Bankr. S.D. Tex. Oct. 14, 2008); In re Martin, No. 06-41010, 2007 WL 2893431 (Bankr. D. Kansas Sept. 28, 2007); In re Stinson, 285 B.R. 239 (Bankr. W.D. Va. 2002); Fiorani v. Caci, 192 B.R. 401 (Bankr. E.D. Va. 1996); In re Hardy, 209 B.R. 371 (Bankr. E.D. Va. 1997); Pastore v. Medford Savings Bank, 186 B.R. 553 (Bankr. D. Mass. 1995); In re Briggs, 143 B.R. 438 (Bankr. E.D. Mich. 1992); In re Madison Madison Intern. of Illinois, 77 B.R. 678 (Bankr. E.D. Wis. 1987). See also Cord v. Skinner Indus., Inc., No. 01-20256, 2004 WL 2923845 at * 2 (Bankr. M. D. Fla. Oct. 14, 2004) ("It is well established now by several cases, that Section 525(b) of the Code applies only to actions taken after an employment relationship has been established and does not cover a situation which might be a discriminatory hiring practice by private employers.").

The only decision the Court has located to the contrary is Leary v. Warnaco, Inc., 251 B.R. 656 (Bankr. S.D.N.Y. 2000).[7] There, the court noted Congress' intent to afford debtors a "fresh start" and interpreted the phrase in § 525(b) "discriminate with respect to employment" to encompass "all aspects of employment including hiring, firing, and material changes in job conditions." Leary, 251 B.R. at 659. The court also held that the "evil"

---

[7]Myers also points to In re Hopkins, 81 B.R. 491 (Bankr. W.D. Ark. 1987) as authority for expanding § 525(b) to cover denials of employment. Hopkins, however, did not involve a claim for denial of employment, but instead involved claims for failure to promote and discriminatory termination. In ruling on those claims, the court stated, without any discussion, that § 525(b) precluded the defendant "from refusing to hire, or promote as the case may be, the debtor solely because of her bankruptcy, once an offer for full-time employment has been extended and accepted." 81 B.R. at 494. This language makes clear that an employment contract had been formed, which is not the case here, at least with respect to Count I. Hopkins is therefore neither binding nor persuasive precedent.

11

being legislated against was no different when a employer fired a debtor as opposed to refusing to hire a person who files for bankruptcy. Id. at 658.

The Court respectfully declines to follow Leary's rationale. If the phrase "discriminate with respect to employment" is interpreted so broadly to include hiring, firing, and material changes in employment, then the phrases "terminate the employment" and "deny employment to" in § 525(a) and (b) would become superfluous and redundant. See Kungys v. United States, 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988) (noting "the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant."). See also Pastore, 186 B.R. at 545 ("The fact that there is specific mention of discrimination in the termination of employment, but no corresponding mention of the inception of employment suggests an intentional omission.").

As the Leary court itself recognized, "[w]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms.'" 251 B.R. at 658-59 (quoting West Virginia University Hospitals, Inc. v. Casey, 499 U.S. 83, 99, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991)). This is exactly what the Court must do, and under the plain terms of the statute, it is clear that Congress prohibited discriminatory hiring decisions in § 525(a) and did not prohibit such conduct by private employers under § 525(b).[8]

---

[8]While section 525 as a whole manifests a Congressional intent - a Congressional policy - to extend a measure of job security to debtors in both the public and private sectors, it is nevertheless a rational, secondary policy choice to distinguish between public and private employers where no dependent relationship has been formed. Being denied a job does not change the status quo; losing a job does.

"[F]ederal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." United States v. Rutherford, 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). This Court must respect and adhere to the Bankruptcy Code as written and may not inject words into § 525(b) which are plainly missing.[9]

Myers' arguments concerning the remedial nature of § 525(b), and the lack of legislative history on point are unavailing. Regardless of the nature of § 525(b), the clear and explicit language of the statute makes plain Congress' intent. Moreover, the lack of legislative history with respect to § 525(b) cuts both ways - Myers has presented no evidence to suggest that Congress intended to prohibit private employers from denying

---

[9]The Court also rejects Myers' reliance on In re Patterson, 967 F.2d 505 (11th Cir. 1992) and Smith v. Bellsouth Telecomm., Inc., 273 F.3d 1303 (11th Cir. 2001). The issue in Patterson was whether or not § 525(b) covered a credit union's refusal to extend certain loan opportunities to members because the members had filed for bankruptcy. The credit union, however, was affiliated with and provided a work related function to the debtors' employer - it was only by virtue of employment that a person could become a member of the credit union. Thus the credit union's actions fell within the phrase "discriminate with respect to employment," and the credit union was found to be a "private employer." Patterson, 967 F.2d at 514. The court in Smith addressed the application of the anti-discrimination provisions of the Family and Medical Leave Act of 1993 ("FMLA"), a completely different statutory scheme with its own extensive legislative history. Moreover, the FMLA did not contain a separate, broader anti-discrimination provision applicable only to governmental entities.

13

employment to debtors.[10] In the absence of any evidence of Congress' intent, and when faced with plain and unambiguous statutory text, the Court must interpret the statute as written - no more and no less. "In the absence of strong indicia of a contrary congressional intent, [a court should] conclude that Congress provided precisely the remedies it considered appropriate." Middlesex Cty. Sewerage Authority v. Sea Clammers, 453 U.S. 1, 14-15, 101 S.Ct. 2615, 2623, 69 L.Ed. 2d 435 (1981).

Summary judgment shall be granted in favor of TooJay's as to Count I.

II.     Count II - Discriminatory Termination

TooJay's also seeks summary judgment in its favor as to Count II, in which Myers argues in the alternative that an employment relationship with TooJay's was created on July 31 and August 1, 2008. Thus, when TooJay's rescinded its offer of employment it was, in essence, firing him solely because of his prior bankruptcy in violation of § 525(b). The Parties agree that termination on the basis of an employee's bankruptcy status violates §525(b). The Parties do not agree, however, as to whether such an employment relationship existed in this case.

Based on the evidence before the Court it is clear that there are material issues of fact in dispute on this point. On the one hand, Myers has testified and submitted other evidence that: (1) Thornton made him an unconditional offer of employment; (2) they finalized all key employment terms, such as start date, hours of operation, job duties, and

---

[10] See Fiorani, 192 B.R. at 406-407 for a thorough discussion of the legislative history behind § 525(b).

salary; (3) he signed numerous employee-related forms, and received a copy of TooJay's employee handbook; and (4) he actually worked for TooJay's for two days. See e.g. In re Burnett, No. 06-34312-H4-13, 2008 WL 4609983 at * 3 (S.D. Tex. Oct. 14, 2008) (noting that if employer had actually offered plaintiff a position and she had accepted the position, an employment relationship would have arisen, and any discrimination thereafter based upon the plaintiff's bankruptcy status would have been unlawful under § 525(b)); In re Hopkins, 81 B.R. at 494 (noting that § 525(b) applies once a full-time offer of employment has been made and accepted). On the other hand, TooJay's has presented evidence in the form of Thornton's testimony that Myers was never employed by TooJay's, and that only a conditional offer of employment was made, contingent on a clean background and credit check. Cf. Middleton v. CSX Transp., Inc., No. 3:06cv417/MCR/EMT, 2008 WL 846121 (N.D. Fla. Mar. 28, 2008).

In order to resolve this issue, the Court would have to credit the testimony of one witness over another. There also appears to be some remaining dispute concerning whether TooJay's did in fact terminate Myers' employment solely because of his bankruptcy, or due to other issues on his credit report. Such determinations are for the ultimate trier of fact, not for the Court at summary judgment. TooJay's motion for summary judgment shall be denied as to Count II.[11]

---

[11]The Court is not persuaded by TooJay's reliance on Cord v. Skinner Nurseries, Inc., No. 01-20256, 2004 WL 2923845 (Bankr. M.D. Fla. Oct. 14, 2004), which is factually distinguishable from the present case. In Skinner, it was undisputed that the plaintiff never performed any
(continued...)

15

III.    Count III - Denial of Wages

Myers has also filed a claim against TooJay's alleging that the company failed to pay him the $200 he earned during the two-day on the job evaluation in violation of § 525(b). TooJay's argues that it is entitled to summary judgment because it did pay Myers the $200 on September 16, 2008, and that Myers has admitted he received such payment. The Court agrees. The facts are undisputed that all wages due and owing to Myers have been paid, and there is no evidence that TooJay's delayed payment solely because of Myers' bankruptcy. Moreover, Myers has presented no legal authority to support a claim under § 525(b) for what amounts to a six week delay in receipt of wages, nor has Myers made any showing of any damages that would have accrued if such a claim existed. Summary judgment shall be granted in TooJay's favor as to Count III.

IV.    Count VI - Claim for Attorney's Fees Under Fla. Stat. § 448.08

In Count VI of his Amended Complaint, Myers purports to assert a separate claim for relief seeking attorney's fees and costs "incurred securing payment of wages due under Florida contract law and wages due under the Bankruptcy Act for bankruptcy discrimination under Florida Statutes, § 448.08" (Doc. 3, ¶ 77). However, there is no stand alone claim for attorney's fees in Florida; such fees can only be recovered pursuant to an entitling statute or an agreement of the parties. See Dade County v. Pena, 664 So. 2d 959, 960

---

[11](...continued)
services for the defendant, never was paid by the defendant, and the relationship between the parties never went beyond an offer letter from the defendant.

(Fla. 1995). Under Fla. Stat. § 448.08, "there must be 'an action for back wages'" to implicate the statutory entitlement to attorney's fees. Id. Because the Court is granting summary judgment on the Plaintiff's Florida breach of contract claim for unpaid wages, there is no state law claim for unpaid wages remaining in this case which would afford Myers any entitlement to attorney's fees.

To the extent Myers seeks to attach his request for attorney's fees under § 448.08 to his remaining claim for bankruptcy discrimination under § 525(b), he has presented no legal authority which would support crafting a state law entitlement onto a federal statutory scheme. Moreover, there is no provision for the award of attorney's fees under § 525(b), and the majority of courts to address this have held that attorney's fees are not authorized under the statute. See Pratt v. Phoenix Home Life Mutual Ins., 285 B.R. 3 (Bankr. D. Oregon 2001); Leary v. Warnaco, Inc., 251 B.R. 656 (Bankr. S.D.N.Y. 2000); In re McKibben, 233 B.R. 378 (Bankr. E.D. Tex. 1999); In re Sweeney, 113 B.R. 359 (Bankr. N.D. Ohio 1990); Bell v. Sandford-Corbitt-Bruker, Inc., No. CV186-201, 1987 WL 60286 (S.D. Ga. Sept. 14, 1987); In re Hicks, 65 B.R. 980 (Bankr. W.D. Ark. 1986).[12] Even if the Court were to hold that attorney's fees were somehow authorized, the evidence is undisputed that Myers has already received all wages owed to him. Summary judgment in favor of TooJay's shall be granted as to Count VI.

---

[12] The Court is not persuaded by In re Patterson, 125 B.R. 40 (Bankr. N.D. Ala. 1990), which awarded attorney's fees without any explanation, and without specifying which portion of fees went towards the plaintiffs' claims under 11 U.S.C. § 362, and which portion was related to the claims under § 525(b).

V.  Affirmative Defense of Waiver

Myers also seeks summary judgment in his favor as to TooJay's affirmative defense of waiver and release.  In its Amended Answer and Affirmative Defenses (Doc. 13), TooJay's argued that when Myer signed the Authorization/Release Form, he "released and allowed [TooJay's] to obtain all information regarding his background and consumer check and further released TooJay's Management Company from all liability for damages of whatever kind which results to him or to his family and associates because of compliance with this authorization and request to release."  (Doc. 13, pp. 6-7, ¶ 6).  TooJay's further argued that Myers was therefore estopped from bringing any claims under § 525(b).

In response to Myers' motion for partial summary judgment, TooJay's stated that due to Polinski's deposition testimony that it was never TooJay's intent to use the authorization form to waive claims of bankruptcy discrimination under § 525(b), TooJay's would withdraw its affirmative defense. (Doc. 36, p. 10).  Accordingly, the affirmative defense of waiver and release shall be stricken and TooJay's is precluded from arguing this issue in any further proceedings in this case.

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)  Defendant TooJay's Management Corporation's Motion for Summary Judgment (Doc. 27) is GRANTED IN PART AND DENIED IN PART.  Summary judgment is granted in favor of Defendant TooJay's Management Corporation, and against Plaintiff

Eric Myers as to Count I (discriminatory non-selection under 11 U.S.C. § 525(b)), Count III (discriminatory non-payment of wages under 11 U.S.C. § 525(b)), and Count VI (claim for attorney's fees under Fla. Stat. § 448.08) as set forth in Myers' Amended Complaint (Doc. 3). In all other respects TooJay's motion for summary judgment is DENIED. The Plaintiff may proceed with his claim for discriminatory termination under 11 U.S.C. § 525(b) (Count II).

(2) The Plaintiff's Motion for Partial Summary Judgment (Doc. 34) is DENIED.

(3) The Plaintiff's claims for unpaid wages under the FLSA and Florida contract law (Counts IV and V) are DISMISSED.

(4) The Defendant's affirmative defense of waiver and release as set forth in its Amended Answer (Doc. 13, pp. 6-7, ¶ 6), is STRICKEN, and the Defendant may not pursue this defense in any further proceedings in this case.

(5) The Clerk is directed to withhold the entry of judgment pending resolution of all remaining claims.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 20th day of October, 2009.

*[signature]*

UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record